Argued December 4, affirmed December 31, 1962

# STATE OF OREGON *v.* COLE
377 P. 2d 168

142

*George P. Haley,* Portland, argued the cause and filed the brief for appellant.

*Lou L. Williams,* Portland, argued the cause for respondent. On the brief were Chester W. Pecore, District Attorney, and Julian Herndon, Deputy District Attorney, Portland.

Before MCALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Roy Wilkins Cole, from a judgment entered by the circuit court which adjudged him guilty of the crime of Knowingly Uttering and Publishing a Forged Bank Check. The judgment was based upon the verdict of a jury and imposed a sentence.

The defendant submits two assignments of error:

"The trial court erred in denying a continuance of the trial on timely motion made by defendant's counsel when it was developed on plaintiff's case in chief that the evidence and testimony presented by the State was a surprise to the defendant, and required a witness not immediately available to the defendant, but who could be found with reasonable certainty."

"Where counsel for the State, on cross examination of the defendant, had asked the defendant whether or not the address given by the defendant on the check in question was a house of ill repute, it was error for the trial court not to grant a mistrial."

We will now consider the first assignment of error.

The check in question purported to bear the signature of one Robert W. Bingham who conducts a mort-

gage brokerage business. After Mr. Bingham had testified that shortly before the alleged crime occurred five hundred of his checks were stolen from his office and that one of them bore the serial number that appears upon the check in question, he testified that the signature, Robert W. Bingham, which appears upon the check as maker was not his. Presently the defendant stipulated that the maker's signature (Robert W. Bingham) which appears upon the check was not that of Mr. Bingham.

The testimony of one Robert L. Ragel, operator of a service station, shows that the defendant came to his establishment and presented the check for cashing. The defendant's name was entered in the check as payee. According to Mr. Ragel, the defendant endorsed the check and produced satisfactory identification and thereupon he paid the defendant the amount of the check, $82.52.

Calvin P. Robertson, a detective in the Portland Police Bureau and assigned to its check detail, testified that after the defendant's arrest he gave several accounts about his connection with the check, including explanations of the manner in which he acquired it, made the entries upon it and forged the maker's signature. In one of these accounts, according to Robertson, the defendant acknowledged that he "picked" this check in its blank condition from the pocket of a friend and then "made out the check in its entirety; that is, made out the face of the check." As a witness the defendant, in one of his accounts about the blank check, swore that he took it from the pocket of a friend.

Sometime before the indictment was returned against the defendant upon which this trial was conducted, he had been found guilty upon another charge, had been sentenced to the penitentiary and had been

granted a parole. Later, a hearing was held in Judge Redding's department of the circuit court for the purpose of determining whether the defendant's parole should be revoked. In the course of the hearing mention was made of the circumstances which underlie the indictment upon which the case now at bar is predicated and thereupon the defendant gave to Judge Redding an explanation of the manner in which he claimed he acquired the check and cashed it. According to Robertson, "he (the defendant) told Judge Redding that the check was obtained from a party" to whom he "had sold a portable Hi-Fi." Robertson testified that after the hearing the defendant, the latter's attorney, himself, and a deputy district attorney by the name of Desmond Connall stopped for a moment in the corridor of the courthouse and engaged in a brief conversation. Robertson testified:

"Q And what did he say, if anything, concerning that story at that time?

"A I asked him why the story; why he told that one. And he said, 'I shouldn't have done it.' He admitted the lie.

"Q Now, I am not sure that I understand you.

"A Well, he admitted that he told a falsehood in the Court to Judge Redding. That is the substance of it all. I can't repeat the exact words.

"Q He told you that he had not told Judge Redding the truth?

"A That's right."

In short, Robertson testified that the defendant, while engaged in conversation in the courthouse corridor outside Judge Redding's courtroom, stated that he had testified falsely before Judge Redding. It will be noticed that Robertson testified that in addition to himself and the defendant there were present the de-

fendant's attorney (Haslett) and a deputy district attorney, Desmond Connall. Upon cross-examination he added that in addition to those four individuals a parole officer by the name of Loren F. Bridge was either present or near-by in the corridor. Under further cross-examination he agreed that an officer by the name of Bokovich possibly was also present.

Shortly after this testimony had been given, the state rested the presentation of its evidence and thereupon defendant's counsel moved

"* * * for a continuance until such time as we can produce Desmond Connall as a witness on behalf of the defendant. We feel that this is a material witness. It was only discovered during the trial that he was a necessary witness on behalf of the defendant."

To an inquiry of the trial judge, "Why do you think that he should testify?" defendant's counsel replied:

"* * * there has been testimony that a certain conversation occurred, which would effect the substantial rights of the defendant, at which time amongst those present was Desmond Connall, Deputy District Attorney of Multnomah County who is now in the army on temporary duty. His whereabouts are unknown at this time by this defendant or his counsel."

At that point the trial judge inquired whether there was any information as to where Mr. Connall could be located. The following is a reply made by defendant's counsel.

"Very little, your Honor. I do know that in the past week or ten days, I believe, or some time last week he was called to active duty as a Captain in the army, and I believe was to report to England. But I am not positive."

The motion for a continuance was denied.

The defendant, upon direct examination by his own attorney, gave the following testimony:

"Q  And isn't it a fact that you told me approximately the same thing that you told Mr. Robertson with regard to getting this check out of someone's pocket?

"A  Yes, sir.

"Q  And during the probation hearing in front of Judge Redding, do you recall what your testimony was there?

"A  Yes, I do.

"Q  Will you tell the Court, as best you can recall, what you said at that time?

"A  Well, at that particular time, I was sitting as I am sitting now in Judge Redding's Court. And he asked me about the check, and how I come to have the check. And I explained to him in the very words that I explained to you.  *   *   *"

We have mentioned that the defendant, in the trial of this case, explained that he obtained the check by picking it from the pocket of a friend. Thus, he had given two explanations about the check. One was that he lifted it as a blank check out of the pocket of a friend, and the other was that he obtained it in its filled-out condition through the sale of a Hi-Fi radio set. Although defendant moved for a continuance until he could procure the testimony of Mr. Desmond Connall, as a witness under direct examination by his own attorney he gave the following explanation concerning what occurred in the corridor of the courthouse at the close of the hearing before Judge Redding.

"Q  Do you recall a milling around in the hallway at all where I was there, and Mr. Connall

representing the District Attorney's office was there, and Mr. Robertson was there?

"A No. As I stated—before I even left the Court room, if I can go back to this particular time when Judge Redding had finished, if you recall, he had mentioned to you that on this particular matter, he said, 'I had advised you to have a jury trial.' And then I went back and sat at the table, and he explained to me the things that I was supposed to do on probation and so forth. And he said that he would reinstate me on my probation. And he asked the District Attorney if there was a warrant, and he said he believed so. And he asked Mr. Robertson, and Mr. Robertson said there was. And he said, therefore, 'I imagine he would want to pick you up and bring you back.' So at that time—at that particular time you got up and asked me to thank the Judge, which I did. I got the probation, and the Judge left the bench. At the same time, the Deputy District Attorney came over and he asked me—he stayed there, I imagine, for a minute or maybe more. And he said, 'Well, it is time for us to go upstairs.' So as we came out of the Court room and into the hall, you were standing there, and you said, 'Well, I will see you probably Tuesday at the City Jail.' Then I don't know who the Detective was, but he took me on upstairs."

That was his explanation concerning the conversation that Mr. Robertson had described. It will be noticed that the defendant claimed that no conversation whatever had occurred in the corridor at the close of the hearing before Judge Redding. We quote further from the defendant's testimony.

"Q How come you decided, when you went into Judge Redding's Court, to not tell the true story?

"A Well, I figured it was just best to go ahead, because as it was, if I had, like I say, explained in the beginning what I told here and knowing the con-

dition that I was in, I felt that I wouldn't be relieved."

Mr. Haslett, the attorney who represented the defendant in the trial court, acknowledged that a brief conversation took place in the corridor outside Judge Redding's courtroom immediately following the parole revocation hearing. We now quote from his testimony as follows:

"* * * I know that I did state to Mr. Cole, 'Your testimony surprised me. That was different than what you had told me in jail.' And he said, 'Well, I was right up there with Judge Redding. I was under oath, and I wanted to tell the truth, and that is the truth.' I do believe that Mr. Robertson stated to him that it was quite a bit different than the stories and statements he had given to Mr. Robertson before. And Mr. Cole, as I recall, stated, 'Well, those are lies, and this is the truth.' With all defference to Mr. Robertson, I know I only stayed there just a few minutes. Perhaps there was some further conversation, and perhaps Mr. Cole did in my absence tell him that he just testified to a falsehood. But I do believe that he was referring—when he mentioned lies, he was referring to that he had lied from the beginning —."

Mr. Bridge, who was mentioned as one of those who were present in the corridor, gave the following explanation of the conversation that followed the hearing before Judge Redding:

"Q  Could you hear all the conversation?

"A  I didn't hear it at all, no, sir; because there was a lot of distractions in the hallway when things were over with. But either Mr. Haslett or Mr. Robertson asked the question of why he gave the particular story that he did on the stand. I don't recall the exact words, but he said that he didn't know why he had related that story. It seemed to be

a sort of confused answer as to why he did such a thing. Any more than that, I can't give you any exact details."

The defendant made no effort to produce the testimony of Mr. Bokovich who he claimed was also present during the corridor conversation.

By way of resume it is seen that the defendant swore that no conversation occurred at the close of the hearing in Judge Redding's department. His attorney, to the contrary, testified that a conversation had occurred and that in its course he told the defendant, "Your testimony surprised me. That was different than what you had told me." The attorney also testified that in the course of the conversation Robertson told the defendant that his testimony was different from "the stories and statements he had previously made" and that thereupon the defendant replied, "Well, those are lies."

■ *State v. Mack,* 57 Or 565, 112 P 1079 (1911), employed a rule enunciated scores of times prior to that case and repeated with equal frequency since then. It said:

"The granting or refusing of a continuance rests in the sound discretion of the trial court, and its determination should not be disturbed, unless manifestly wrong and arbitrary, involving an abuse of such discretion.  *  *  *"

■ It will be noticed that the defendant gave various accounts about the check and even surprised his own attorney by telling a story from the witness stand different from the one that he had given shortly before in preparation for the trial. No one knew where Mr. Connall was located. Likewise, no one could have been certain whether Mr. Connall heard the conversation that Mr. Robertson had described. It will be recalled

that the defendant denied that any conversation whatever had occurred. We cannot say that any error was committed when the motion for a continuance was overruled. This assignment of error is plainly lacking in merit.

■ We have quoted the second assignment of error. The ruling upon which it is based occurred after the defendant had answered upon direct examination that he resided at 139 N. E. Halsey Street in Portland, and the State's counsel, upon cross-examination, was questioning him concerning that answer. As the cross-examination proceeded, the defendant admitted that his wife did not live at 139 N. E. Halsey Street, but resided on the west side on Second Avenue. Presently, the Deputy District Attorney asked the question upon which the motion for a mistrial is directly based. The defendant did not answer the question, and the trial judge instructed the jury that it was an improper question and that the jurors should disregard it. In the oral argument which preceded the ruling it was conceded by the defendant's counsel that the house located at 139 N. E. Halsey Street was at one time "a house of ill repute." The defendant, under examination by his counsel, stated that his wife, at the time of the trial, was "in Rocky Butte," that is, in the county jail. The defendant, 29 years of age, gave the following account of his own criminal record:

"A  Well, I have been convicted of larceny of an auto. And prior to that, I was picked up for after hours here. And when I was in California, I was picked up for vagrancy and another misdemeanor charge. And due to that, I received another charge of forgery of bonds. I served four years in jail for that. After that, I came to Sacramento and lived, and I was arrested there for 30 days for a vagrant charge. I was sent back to McNeil. And when I

came back from McNeil, I stayed here in Portland. In September 21, 1958, I was arrested again for burglary; two charges of burglary. And I went to—at that time I received three years in the penitentiary, and three years suspended and five years probation. And I got out of there in September of 1960; the 21st.

"Q You were convicted of larceny of an automobile as I understand you?

"A That's correct.

"Q And vagrancy in Sacramento?

"A Yes.

"Q And forgery of United States Treasury bonds?

"A That is correct.

"Q Then you were convicted again of vagrancy, and then you were convicted of burglary?

"A That's right."

The motion for a mistrial was largely directed to the discretion of the trial judge. We are aware of no reason to believe that the discretion was abused. After the trial judge had instructed the jury to disregard the question he denied the motion. This assignment of error is without merit.

The judgment of the circuit court is affirmed.

GOODWIN, J., did not participate in this opinion.